In the Matter of the Estate of EDWARD R. MURPHY, Deceased.

Surrogate's Court, New York County, December 17, 1930.

*John P. Cohalan*, for the executors.

*John J. Lenehan*, for the committee.

*Edward B. Schulkind*, referee.

O'BRIEN, S. This is an accounting proceeding by Timothy Murphy and Julia Murphy, as executors of the above-named testator. The latter died October 3, 1925, and his will executed August 13, 1919, was admitted to probate on October 13, 1925. On January 22, 1929, the account was filed. Objections were filed to the account by the committee for Rose Murphy, the widow, who is an incompetent. The account was thereafter sent to a referee who has taken considerable testimony and filed his report on August 19, 1930, and exceptions thereto were filed on behalf of the incompetent which raise the following questions: (1) The valua-

tion of a leasehold; (2) unpaid income to the widow; (3) interest on unpaid income, and (4) increment of the amortization fund. The testator by the 3d paragraph of his will provided as follows:

"*Third.* I give and bequeath to my executors and trustees hereinafter named, out of the balance remaining, the sum of Forty thousand ($40,000) dollars in trust for my wife Rose Murphy during her lifetime, to be held and invested safely by them for her benefit, and the income thereof to be paid over to her by my said executors and trustees, less the necessary expenses of preserving and caring for said trust."

By the 5th paragraph of the testator's will this provision for the widow was made in lieu of dower. The will further bequeathed to the testator's widow Rose, his mother Julia, and his brothers Thomas, Timothy, John and Joseph, and his sisters Julia and Loretta, each the sum of $1,000 and directed that these legacies "have priority and be paid first in preference to any other bequests." The assets of the estate consisted of cash in the bank $1,268.84, insurance $9,824.10, totalling $11,092.58. There were other assets consisting of stock, a note and a claim which netted the estate an additional $3,266.82, making a total of cash in the sum of $14,359.40. The payments of debts, expenses of administration, funeral expenses and the preferred legacies totalling $8,000 left the executors without funds with which to set up the trust of $40,000 for the benefit of the widow as directed by the 3d paragraph of the will. The only other asset of the estate consisted of a leasehold on property at the northwest corner of One Hundred and Twenty-fifth street and Twelfth avenue, from one W. Sheehan to the deceased dated May 1, 1916, for nineteen years and expiring May 1, 1935. The rent reserved was $2,500 per annum plus the taxes, so that at the time of the testator's death in 1925, this leasehold had nine years and seven months to run. This property was sublet by the deceased to two tenants, the first tenant being Fass & Fass, by a lease dated September 23, 1921, for nine years and six months and expiring April 30, 1931. The rent reserved for the first five years of this lease is $3,000 per annum and for the last four years and six months $3,600 per annum. The second sublease was made to Max Buxbaum dated February 13, 1924, for the term of ten years from May 1, 1924, to April 30, 1934. The rent reserved in this lease was $4,800 for the first five years and $5,400 for the last five years. These leases now produce $9,000 a year. To the rental of $2,500 paid by decedent's estate to Mr. Sheehan on the main lease was added the taxes for 1926, the year after the death of the testator, which amounted to $858.46; for the year 1927, $855.35; for the year 1928, $1,081, a total of $2,794. The account-

ing shows that all these taxes were paid. This account also shows that down to January, 1930, the gross rentals received were $27,350 and the rentals to accrue amount to $56,100. *As there were no assets out of which to set up the trust fund of $40,000, the executors retained the only asset available which was this leasehold and they have accumulated the income thereon.* However, the leasehold being a wasting security, it becomes necessary to apportion the income between the life tenant and the remaindermen. (*Frankel* v. *Farmers' Loan & Trust Co.*, 152 App. Div. 58; *Matter of Hall*, 127 Misc. 238; *Matter of Hall*, 130 id. 313; *Matter of Golding*, 127 id. 821.) For said apportionment an evaluation of said leasehold had to be made. This was the basis of the main controversy before the referee. After hearing all the evidence and applying the rules laid down by the authorities he found that the value of the leasehold is $30,000 and that five per cent per annum on this valuation should be allowed as income payable to the life tenant and that the balance of the net income should be retained in an amortization fund to be held as the principal of the trust fund and preserved for the benefit of the remaindermen. This is a motion by the executors to confirm the referee's report. The committee of the widow excepts to the finding of the referee that the correct value of this wasting security is $30,000 and urges that it should be fixed at a much higher figure. On the other hand, the executors support this finding as to value. The record shows that general appraisers in this court fixed the value of this lease at $10,000 and that it was fixed at the same amount in the transfer tax proceeding by the transfer tax appraiser. Real estate experts produced before the referee valued this lease at $22,000 and at $21,875.66 respectively. It appears from the evidence that there is no guaranty that the leases of the subtenants, which leases produce the net profit to this estate, can be renewed at their expiration date, at the same rental, at a reduced rental, at a greater rental or that they can be renewed at all; that the Fass lease expires in 1931 which is four years short of the expiration date of the main lease which is 1935; that the Buxbaum lease expires April 30, 1934, which is *one year* short of the expiration date of the main lease; that whether or not the Buxbaum lease could be renewed for so short a period as one year is uncertain, and that it is possible that the premises may be vacant, thus for the last year of the term of the original lease causing a loss; that the approximate net return to the estate for the balance of the term after the payment of debts, insurance and other incidental expenses will be $4,920; that five per cent of the $30,000 valuation fixed by the referee would be $1,500, so that on said value each year $3,420 would be added to the amortization

fund. The committee for the incompetent strongly urge that $45,000 or at least $40,000 is a fair valuation of the leasehold. They produced experts *who placed valuations upon the leasehold at $36,463 and $34,549 respectively.* They build an argument out of the net rentals during the elapsed period of the subleases and contend that "since $22,933.26 is the net for four years and four months (and assuming that insurance, taxes and rents continue substantially the same) the net for nine years and seven months will be $50,716.26 plus Buxbaum increase at $600 for four years and three months, $2,550, total $53,266.26;" and they argue further that "the referee has found the lease to be worth only $30,000. Taking the referee's own figures for four years and four months (to January, 1930) the lease has produced net $21,323.35, this is $4,920 net per annum. At this same rate the remainder of the lease five years and three months will produce net $25,830; total, $47.153.35; to which should be added interest earned on rents invested, which for three years and three months amounted to $1,166.34." These arguments assume that the subtenants will renew their leases for the terms of *four years and one year respectively* at the expiration of their leases, thus rounding out the term of decedent's leasehold. This event is problematical, no matter what the locality offers by way of central location, traffic conditions, railroad facilities, etc. There are many factors to be considered in such a forecast and the brevity of the time intervening between the expiration of the main lease and the subleases, viz., four years and one year, is an important element of disadvantage. The experts of the committee of the incompetent placed valuations of $36,463 and $34,549 respectively on said leaseholds. An average of these two valuations and the two valuations of the executors' experts is $28,271. The controversy submitted to the referee was almost entirely a question or questions of fact. The report of the referee is confirmed. Submit decree.